**CHECKRITE PETROLEUM, INC.,**
**Plaintiff-Appellee-Cross-Appellant,**

v.

**AMOCO OIL COMPANY,**
**Defendant-Appellant-Cross-Appellee.**

Nos. 771, 795, Dockets 81–7792, 81–7832.

United States Court of Appeals,
Second Circuit.

Argued Feb. 25, 1982.

Decided April 1, 1982.

Richard R. Lutz, New York City (Townley & Updike, New York City, of counsel), for defendant-appellant-cross-appellee.

Jacob E. Heller, New York City, for plaintiff-appellee-cross-appellant.

Before FEINBERG, Chief Judge, and VAN GRAAFEILAND and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

Amoco Oil Company ("Amoco") appeals from a judgment of the United States District Court for the Southern District of New York, Brieant, J., enjoining it under the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801 *et seq.* (Supp. IV 1980) ("PMPA"), from terminating[1] its agreement with Checkrite Petroleum, Inc. ("Checkrite") except in accordance with the PMPA and awarding Checkrite attorney's fees. Because we find that the PMPA does not apply to the relationship between Amoco and Checkrite, we reverse.[2]

## BACKGROUND

On March 31, 1976, Amoco and Checkrite entered into a contract covering the five-year period ending May 30, 1981. The agreement, which was drafted by Amoco, designated Checkrite a "broker." Under the terms of the contract, Checkrite agreed to "cause" retail gasoline dealers listed in an attached Schedule "A"

> to execute and deliver to Amoco Dealer Sales Agreements on Amoco's standard form being offered to Amoco in the Metropolitan New York City area whereby such dealers contract to purchase from Amoco, petroleum products for resale at said service stations.

App. at 18. As consideration for Checkrite's efforts, Amoco agreed to pay Checkrite a commission of 1.9 cents on each gallon of gasoline and ten percent on the dollar volume of motor oil sold by Amoco to the dealers listed on Schedule "A".

Amoco entered into contracts directly with these retail dealers under which Amoco agreed to sell and to deliver gasoline and diesel fuel to the dealers at its standard prices. The dealer agreements also provided for the dealers' use of Amoco's trademark.

Amoco informed Checkrite by letter dated November 25, 1980 that it did not intend to renew or extend its agreement with Checkrite after the May 30, 1981 expiration date. Checkrite then instituted this suit, claiming that it maintained a "franchise relationship" with Amoco and was therefore protected against termination under the PMPA. The complaint sought actual damages, exemplary damages, injunctive and declaratory relief, attorney's and expert witness' fees, costs and disbursements.

The district court ruled that while Checkrite would not be entitled to protection under a "narrow reading" of the statute,

---

1. Because Checkrite's agreement with Amoco expired under its terms before the district court issued the injunction in this case, the injunction should, technically, have prohibited Amoco from failing to renew the agreement under 15 U.S.C. § 2802(a)(2), rather than from terminating the agreement under 15 U.S.C. § 2802(a)(1). For clarity, we adhere to the

district court's terminology which apparently has not confused the parties in this case.

2. Checkrite cross-appeals from the district court's denial of its request for damages. Because we hold that Checkrite is entitled to no relief under the PMPA, we affirm the denial of a damage award.

Checkrite fits within the purpose of the PMPA as an independent entrepreneur whom Congress thought worthy of protection against unjustified termination; therefore Checkrite is a franchisee within the purpose of the statute.

App. at 86. Accordingly, the court granted summary judgment for Checkrite.[3]

## DISCUSSION

The purpose of the PMPA is to establish "minimum Federal standards governing the termination and nonrenewal of franchise relationships for the sale of motor fuel by the franchisor or supplier of such fuel." S.Rep.No.95–731, 95th Cong., 2d Sess. 15, *reprinted in* [1978] U.S.Code Cong. & Ad. News 873, 873. Section 102 of the PMPA, 15 U.S.C. § 2802, prohibits a franchisor from terminating or failing to renew a franchise without satisfying certain notice provisions and without stating a reason for termination sanctioned by the act. It is undisputed that Amoco did not satisfy the PMPA termination requirements in its dealings with Checkrite. The issue in this case is whether Checkrite is a "franchisee" within the meaning of the act.

"[I]n any case concerning the interpretation of a statute the 'starting point' must be the language of the statute itself." *Lewis v. United States*, 445 U.S. 55, 60, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Products Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Russo v. New York*, 672 F.2d 1014, 1022 (2d Cir. 1982). The PMPA contains the following relevant definitions:

As used in this subchapter:

(1)(A) The term "franchise" means any contract—

(i) between a refiner and a distributor,

(ii) between a refiner and a retailer,

(iii) between a distributor and another distributor, or

(iv) between a distributor and a retailer,

under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

. . . .

(2) The term "franchise relationship" means the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

. . . .

(4) The term "franchisee" means a retailer or distributor (as the case may be) who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

(5) The term "refiner" means any person engaged in the refining of crude oil to produce motor fuel, and includes any affiliate of such person.

(6) The term "distributor" means any person, including any affiliate of such person, who—

(A) purchases motor fuel for sale, consignment, or distribution to another; or

(B) receives motor fuel on consignment for consignment or distribution to his own motor fuel accounts or to accounts of his supplier, but shall not include a person who is an employee of, or merely serves as a common carrier providing transportation service for, such supplier.

(7) The term "retailer" means any person who purchases motor fuel for sale to the general public for ultimate consumption.

---

**3.** The district court enjoined Amoco from terminating its agreement with Checkrite without complying with PMPA requirements and awarded Checkrite attorney's fees. The court denied Checkrite's pleas for other relief.

. . . .

(15) The term "affiliate" means any person who (other than by means of a franchise) controls, is controlled by, or is under common control with, any other person.

15 U.S.C. § 2801.

■■■ Checkrite neither purchases motor fuel nor receives it on consignment from Amoco. Therefore, Checkrite is neither a "distributor" nor a "retailer" within the plain wording of the PMPA.[4] Because only retailers and distributors fall within the statute's definition of "franchisee," Checkrite is not within the PMPA's plain terms. It is a well-established rule that "when words are free from doubt they must be taken as the final expression of the legislative intent, and are not to be added to or subtracted from by considerations drawn . . . from any extraneous source." *Caminetti v. United States,* 242 U.S. 470, 490, 37 S.Ct. 192, 196, 61 L.Ed. 442 (1917); *Board of Education v. Harris,* 622 F.2d 599, 609 (2d Cir. 1979), *cert. denied,* 449 U.S. 1124, 101 S.Ct. 940, 67 L.Ed.2d 110 (1981). Strict construction is particularly appropriate where, as here, the statute in question is in derogation of common law rights. *See, e.g., In re Liberatore,* 574 F.2d 78, 85 (2d Cir. 1978); *United States v. Mead,* 426 F.2d 118, 123 & n.5 (9th Cir. 1970); *Bauers v. Heisel,* 361 F.2d 581, 587 (3d Cir. 1966), *cert. denied,* 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457 (1967).

Despite these well-known canons of statutory construction, and notwithstanding its failure to satisfy the unambiguous statutory definition of "franchisee," Checkrite argues, and the district court found, that the legislative history of the PMPA indicates that Congress intended to "accord broad protection to persons 'marketing' branded fuels." App. at 80. The court held, therefore, that Checkrite was within the intended scope of PMPA protection. Even if it were necessary in this case to search beyond the statutory language for an expression of legislative intent, we would disagree with the district court's conclusion.

The district court relied principally on two passages of legislative history in concluding that Checkrite is a "franchisee." First, the court cited the Senate Report on the PMPA, which states:

The committee also sought to resolve a problem raised by the definition of "distributor" in title I. Under H.R. 130 as presented to the committee a distributor includes a person or his affiliate "who receives motor fuel on consignment for consignment or distribution *to his own motor fuel accounts.*" (emphasis added)

The question arises of distinguishing a consignee's accounts from those of his supplier. The committee was concerned that a consignee might be treated as a distributor under H.R. 130 with respect to some accounts but not with respect to others. Rather than attempt to delineate a means of making this distinction as to ownership or control of the accounts, the committee chose to treat a consignee as a distributor regardless of whether the account is that of the consignee or of the supplier.

However, the committee included a proviso that the definition of distributor does not include employees of the supplier, nor a person who merely serves as a common carrier who provides transportation services for the supplier. With this proviso the committee retained the distinction that independent entrepreneurs are to be included as distributors while employees of the supplier or those common carriers who merely supply transportation as would a common carrier are not distributors under this definition.

S.Rep.No. 95–731, 95th Cong., 2d Sess. 27, *reprinted in* [1978] U.S.Code Cong. & Ad. News 873, 885.

The relevance of this passage to the issue in this case is dubious. In any event, the

---

4. Checkrite persists in the argument, rejected by the district court, that it is an affiliate of Amoco and is therefore a "distributor" under the PMPA. Since there is no basis in the rec-

ord to support a finding that Checkrite "controls, is controlled by, or is under common control with" Amoco, we need not pass on the rest of Checkrite's reasoning on this point.

passage provides no support for Checkrite's position. The passage specifically addresses particular problems of the definition of "distributor" as it relates to consignees. Because consignees are covered by the PMPA's definition of "distributor" the Senate Report suggests no congressional intent beyond that expressed by the statute's plain terms.

The district court also relied heavily on the remarks of Representative Dingell during the House debates on the PMPA:

> It was our intention to cover a consignee or commission agent where he in fact provides the functions and services of a jobber. It was not intended that a consignee would be covered if, in fact, he is an employee. This is a question of fact resolution of which lies in the hands of the courts whose job it will be to see that fairness is accorded to all parties.
>
> Let me read from the report. The report states:
>
> > '[I]t is intended that the provisions of the title would apply to a consignee who acts generally like a jobber.'
>
> What I am saying is that where a person has the characteristics of an employee, although he in fact does handle the product, he is not covered. It is not our intention to expand the rights of employees. Where a consignee functions, however, as a jobber and does everything that a jobber would do, save taking title to the motor fuel—or most of what a jobber does—he would then have the protections afforded by the legislation. We have tried to draw that very narrow distinction. It is not our goal to create problems for either side in this controversy but to leave this as a fact question which will be properly and prudently decided by the court.

123 Cong.Rec. 10386 (1977).

We do not think that these remarks constitute "a clearly expressed legislative intent", *Consumer Products Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. at 108, 100 S.Ct. at 2056, to cover parties not within the terms of the statute. Representative Dingell was addressing the distinction between an employee of a refiner who is technically a consignee and an independent consignee. Like the references to "consignee" in the Senate Report discussed above, Representative Dingell's remarks do not contradict or go beyond that which is expressed in the plain words of the PMPA. The single reference to "commission agent" is, at most, ambiguous and hardly constitutes a sufficient ground for ignoring the statutory language.

The district court's reliance on Representative Dingell's reference to jobbers and on the claimed similarities between Checkrite and a typical jobber is also misplaced. The term "jobber," which is not defined in the PMPA, is generally taken to mean "[o]ne who buys and sells goods for others[,]" Black's Law Dictionary 970 (4th ed. 1968), or "wholesaler[,]" Webster's Third New International Dictionary 1217 (1971). Thus, a typical branded fuel jobber would fit squarely within the PMPA definition of "distributor." Because Checkrite does not buy and sell motor fuel, it is not a typical jobber; hence Checkrite is not a distributor; and therefore Checkrite is not a franchisee entitled to protection under the PMPA.

Checkrite's final argument, adopted by the district court, is that termination of its contract with Amoco will have the same effect on the dealers covered by the contract as direct termination of the dealers by Amoco. Checkrite, claiming that it has the power to order dealers to sell or not to sell any brand of gasoline it chooses, reasons that if it is terminated by Amoco, it will in turn cause the dealers to terminate their agreements with Amoco. Thus, Checkrite appears to argue that if Amoco can terminate it with impunity, it can circumvent the protections that the PMPA provides against unfair termination of dealers.

This "logic" is wholly unpersuasive. The PMPA is aimed at preventing unfair and discriminatory termination of franchisees by franchisors. Amoco readily concedes that its relationships with the retail dealers involved in the Amoco-Checkrite contract are governed by the PMPA and that it cannot terminate those relationships with-

out complying with the statute's provisions. The dealers are threatened only by Checkrite. That Checkrite might take action detrimental to dealers certainly does not provide Checkrite with rights against Amoco under the PMPA.[5]

In summary, we hold that the plain terms of the PMPA do not provide Checkrite any protection against termination by Amoco, and that the legislative history of the act expresses no congressional intent to go beyond these plain terms. Therefore, we reverse the judgment of the district court and remand this case with directions to dismiss the complaint and to vacate the award of attorney's fees.

So ordered.

---

**5.** As an alternative ground for reversal Amoco asserts that Checkrite is not a "franchisee" because the Amoco-Checkrite agreement does not authorize Checkrite to use Amoco's trademark as required by 15 U.S.C. § 2801(1)(A) & (2). Because we find that Checkrite does not meet the threshold requirement of being a "retailer" or "distributor" within the meaning of the PMPA, we need not determine whether Checkrite also fails to meet the requirement of being "authorized or permitted" to use Amoco's trademark.